(107 App. Div. 58*l*.)

### WEEKS v. CITY OF MIDDLETOWN.

(Supreme Court, Appellate Division, Second Department. October 6, 1905.)

MUNICIPAL CORPORATIONS—CONSTRUCTION OF SEWERS—ASSESSMENTS—JURISDICTION OF COUNCIL.

The charter of the city of Middletown provides two methods for construction of sewers: First, sewers benefiting property in the city generally, to be paid for by a general tax; and, second, sewers of local benefit, to be paid for by assessment of the property benefited—and provides that before ordering the latter improvement the council shall cause notice of pendency of application to be published, stating when they will meet to hear reasons of persons interested therein for and against the same. *Held*, that there could be no assessment for construction of such sewer in the absence of the required notice.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, § 781.]

Appeal from Special Term, Orange County.

Action by Benjamin F. Weeks against the city of Middletown. From a judgment dismissing the complaint, plaintiff appeals. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and RICH, JJ.

John F. Bradner, for appellant.

Russell Wiggins, for respondent.

RICH, J. This action was brought to vacate and set aside an assessment made by the defendant against the lands of the plaintiff for the construction of a sewer, and from the judgment of the Special Term dismissing the complaint on the merits this appeal is taken.

On May 27, 1901, a petition, signed by 24 taxpayers and property owners, in the following language, was presented to defendant's common council:

"To the Honorable Common Council, City of Middletown, New York: We, the undersigned taxpayers and property owners on Olive street, Knapp avenue, Lake avenue, Liberty street, Wallkill avenue, Watkins avenue, Commonwealth avenue, Columbia Park, and other streets located in what is known as the 'Black Dirt Watershed,' do hereby petition your honorable body to construct a sewer in or along the edge of the Black Dirt for the relief of the sanitary matters in this district, or construct a series of sewers to accomplish the same result, if that is found more expedient."

This petition was referred to the sewer committee to investigate and report at the next meeting. The minutes of the common council show that at the next meeting (July 8, 1901) the sewer committee reported favorably on the Black Dirt sewer system, the report was accepted, and the city engineer directed to make a map and profile and submit the same to the sewer commissioners for their approval. At their next meeting (August 26, 1901) the common council adopted the following resolutions:

"Resolved, that the specifications for the sanitary sewer to be constructed as prepared by City Engineer Smith be approved by this council. * * * *

"Resolved, that a trunk sanitary sewer, to be known as the 'Black Dirt Trunk Sewer,' be constructed to connect Monhagen avenue sewer according to the map and profile approved by the sewer commissioners and adopted by the council at this meeting. Said sewer to be 3,860 feet in length."

Under this resolution the sewer in question was constructed. The rights of way and easements required and necessary for the construction and maintenance of this sewer across and over 12 different pieces of real property were acquired under written agreements; the consideration therefor being expressed as follows:

"The consideration for this conveyance is an agreement which said party of the second part hereby makes, by which the party of the second part covenants and agrees to pay, discharge, and save harmless the parties of the first part from any and all assessments and liens which may be levied, made, or laid against the parties of the first part, their heirs and assigns, forever, or against the whole or any part of the lands and premises of the parties of the first part, for by reason of, or on account of the present construction of what is known as the 'Black Dirt Sewer,' as shown on the

95 N.Y.S.—23

map above referred to, of, by reason of, or on account of the construction
of an extension of the Prospect Street Sewer herein mentioned, of, by reason
of, or on account of the construction of any outlets for above sewers to and
into the sewer system of the city of Middletown, N. Y."

The amounts subsequently assessed against the property, represent-
ed by said agreements and paid by the city, was $2,081.38. The cost
of the sewer was $9,555.83.

The first question presented by the appellant is that the defendant's
common council was without jurisdiction or power to order or con-
struct this sewer at the expense of the owners of property benefited,
and that the requirements of defendant's charter were not complied
with in its ordering, acquiring the rights of way and construction.
Title 14 of the charter consists of nine sections, and is entitled "Of
Sewerage and Drainage." Section 2 provides:

"To the end that the city of Middletown may be provided with and have
sufficient and proper drainage and sewerage, the said common council is here-
by authorized and empowered to agree for and to purchase and take convey-
ances for, in the name of said city, any real estate and right of way over
any real estate,  *  *  *  for the purposes of such drainage and sewerage to
any suitable and proper place; and in case said common council does not
agree for the purchase of such real estate, or rights of way,  *  *  *  for the
purposes aforesaid, from any of the owners of such real estate,  *  *  *  the
said common council may acquire the title and right to the same or any part
thereof, for the purposes aforesaid, provided the owners of such lands are com-
pensated for the damages which they may sustain by reason thereof, as
hereinafter provided."

Sections 3, 4, 5, and 6 specify the manner of acquiring such rights
of way as the city is unable to purchase for a reasonable compensation.

Section 7 provides that the money needed to pay for the—

"Lands, rights or awards, and the cost of said improvement, including the
necessary expenses incurred by said common council in connection therewith,
shall be raised by tax, to be assessed upon all the real and personal property
in said city," etc.

Section 9 provides:

"All real estate and rights acquired by said common council, pursuant to
the foregoing provisions for the purposes aforesaid, shall be deemed to be ac-
quired for public use."

Title 6 of said charter consists of 14 sections, and is entitled:

"Of streets and bridges and the improvement thereof, and of nuisances,
and the abatement thereof."

Section 1 gives to the common council the power, and makes it its
duty:

Subdivision 1: "Upon their own motion, or upon application as hereinafter
provided to lay out, open, make, amend, repair, alter, widen, straighten, ex-
tend, contract or discontinue  *  *  *  drains, culverts, and sewers in said
city.  *  *  *"

Subdivision 2: "To cause  *  *  *  sewers to be built or constructed.
*  *  *.  And in the order directing the construction of a sewer or sewers,
*  *  *  they may, in their discretion, provide that a portion of the expense
of such improvement, not exceeding one-third thereof, shall be paid out of
the city treasury."

Section 5 provides:

"Whenever an application shall be made by three or more freeholders to
the common council to  *  *  *  construct or rebuild any sewers, aqueduct,

or bridge, they shall, before ordering such improvement cause a notice of the pendency of such application to be published twice a week, for two weeks, in two public newspapers printed and published in said city, stating the time when they meet to hear all persons interested in said improvement. * * * At such meeting, or at such adjourned or subsequent meeting at which the common council shall order such hearing to be had, they shall hear such reasons as shall be given by or on behalf of persons interested for or against the making of such improvement. * * * And the common council shall have power to enter upon any lands in said city, for the purpose of making surveys, and to construct upon the same any sewer or sewers deemed by them necessary and proper to be constructed, and to acquire the title to any lands or easements therein, for the purposes of such sewer or sewers and the same proceedings shall be had and taken to acquire such lands or easements therein, and to assess the expenses, damages and benefits resulting therefrom, in the matter of the construction of any such sewer as is provided by this act, for the laying out and opening of streets in said city," etc.

The manner in which easements required for opening and laying out streets were authorized to be acquired is specified in section 7, and is limited to condemnation proceedings. No power to purchase such rights is given. By section 6 it is provided that:

"No application to * * * construct or rebuild any sewers [except in the cases hereinafter mentioned] in any part of the city, shall be entertained or in any manner acted upon by the common council of said city, unless the person or persons making such applications shall own at least one-third of the number of feet fronting on the line of the proposed improvement. But whenever the board of health of said city, by resolution duly passed by said board, shall request the common council to order the construction or rebuilding of a sewer through or in any part of any street, lane or highway of said city to be designated in said resolution, on the ground that the same is necessary as a sanitary measure, then the common council is hereby authorized to order and direct the same to be done, without requiring the application therefor, as in this section first above provided."

Section 13 provides the manner of collection of the cost of construction by assessment upon the real property benefited by the improvement.

Reading the different sections of this charter together, and giving effect to all, the legislative intent, which must always control and be given weight in the construction of a statute, is plainly apparent. Two widely differing methods for the construction of sewers in the city of Middletown are provided—one applying to the construction of sewers to be paid for by a general tax benefiting all property owners of the city; the other applicable to the construction of sewers benefiting only property in the immediate vicinity of the improvement, and to be paid for wholly or in part by the property benefited by their construction. In the former class the procedure is governed by the provisions of title 14, and the city proceeds on its own motion without request of, or notice to, its taxpayers. The attention of its common council may undoubtedly be directed to the necessity of such a sewer by a petition, under the provision of title 6, but its subsequent proceedings must not be based on such petition. It must proceed on its own motion, and the cost of a sewer so constructed must be paid by general tax. In the latter class the procedure is regulated by the provisions of title 6. The owners of the property benefited are required to pay

the whole or part of the cost of construction, and the city has no power
to order or build until it has first, and as a condition precedent, com-
plied with those provisions of the title designed to give notice and an
opportunity to be heard to those of its citizens whose property will
be affected by the improvement; and in no case is an improvement
under this title authorized until such notice has been given and oppor-
tunity afforded. The provisions referred to required, first, an appli-
cation to the common council for the construction of the sewer, united
in by the owners of at least one-third of the number of feet fronting
on the line of the improvement, and, second, publication for two weeks
of notice of the pendency of the application and the time when the com-
mon council would consider the same and hear all persons interested,
which notice could not be dispensed with. Until such requirements
had been complied with, the common council was without power or
jurisdiction to proceed with the improvement.

The Black Dirt trunk sewer was within the latter class, and its con-
struction governed by the provisions of title 6. It was not proposed
to construct it at the expense of the city at large, to be paid for by a
general tax, but as a local improvement, benefiting property within a
small district, and to be paid for by such property. It is therefore
immaterial whether the city proceeded in its construction upon its
own motion (as claimed by counsel for the respondent), or upon the
application made to its common council by 24 of its taxpayers and prop-
erty owners on May 27th, asking for its construction. In either case,
whether acting upon its own motion or upon the petition referred to
(assuming it to have been signed by the requisite number of property
owners), it was necessary, before jurisdiction could be acquired
which would justify an assessment to pay the expense of its construc-
tion, that the requirement of the charter as to the publication of notice
of an intention to consider the project, with an opportunity to be
heard, should be given to all persons whose property and legal rights
would or might be affected by the assessment later to be made; and,
until such notice and opportunity to be heard had been given, the com-
mon council was without power or jurisdiction to order the sewer
constructed, or build it, at the expense of the property benefited. I
understand it to be conceded that the required notice was not published,
and that no opportunity to be heard was given. This omission was
of itself fatal to the validity of the assessment.

The record discloses that the common council in its proceedings
in several instances—notably the manner in which the rights of way
required were obtained—disregarded the charter provisions applica-
ble to the construction of the sewer in question; but, in view of our
disposition of the appeal, it is unnecessary for us to consider the de-
parture from the charter provision further than has already been done.

The judgment appealed from must be reversed, and a new trial
granted; costs to abide the final award of costs. All concur.